## Case No. 15,407.

### UNITED STATES v. HOXIE.

[1 Paine, 265.] [1]

Circuit Court, D. Vermont. Oct., 1808.

#### TREASON—RESISTANCE TO LAW.

A resistance of the execution of a law of the United States, accompanied with any degree of force, if for a private purpose, is not treason. To constitute that offence, the object of the resistance must be of a public and general character.

[Cited in U. S. v. Hanway, Case No. 15,299.]

This was a trial for treason in levying war against the United States. The offence charged in the indictment was, that the prisoner [Frederick Hoxie], being a citizen of the United States, and intending to oppose the execution of the laws thereof, and especially the embargo law, on the 13th day of June, 1808, at Alburgh, Vermont, assembled with a company of sixty armed men, and resisted the collector of the district of Vermont, in the execution of the duty of his office, and with force and arms, took and rescued from his custody a certain raft of timber which had been seized by the collector when on its way into Canada, and was then moored and guarded by the troops of the United States, who were aiding the collector. And that the defendant, in further prosecuting the war thus levied, and in order more effectually to rescue the said raft, in company with the rest, fired upon the collector and troops, and thereby intimidated them from detaining and keeping possession of the raft: and that the defendant with his confederates then took the raft into Canada. It appeared from the testimony of witnesses examined on the trial, that one Vandusen had sent a raft of timber from Whitehall to be transported into Canada, contrary to the provisions of the embargo laws. When it had reached the Isle of Mott in Lake Champlain, it was seized by the collector of Vermont, and placed in the custody of a company of militia. While the troops were at some distance from the raft, a company of about sixty men hired for the purpose, and armed some of them with a dozen muskets, and the rest with clubs and spike-poles, assembled with the intention of rescuing the raft, and if necessary, of making prisoners of the troops who guarded it. They got possession of the raft, however, without any resistance, no one being near it, and proceeded on with it towards Canada. In about an hour, as the raft passed a point of the shore, twenty rods distant, the troops fired upon it, and those on the raft returned the fire. This firing continued until the raft was beyond the reach of musket shot. About one hundred shots were fired from the raft, and the balls struck trees on the shore, and the shot from shore also struck the raft, but no persons were wounded. The firing was in earnest and intended for execution. The

men were to have 800 dollars if they took the raft into Canada, but if they did not succeed they were to get nothing. At the time they took possession of it, the sentinel who had been placed over it was a quarter of a mile off, and the men were told that the collector was willing that the raft should be taken away, and it was believed that they would meet with no opposition. The prisoner was on the raft, firing pretty actively, but he was opposed to the proposition which was made in the first instance, to make prisoners of the troops who guarded it. After the raft was got into Canada, Vandusen paid off the men and they returned home. There was evidence that the prisoner had been engaged in other attempts, to pass the lines with potashes, and that he had occasionally talked about fighting his way through. But there was no evidence that he had ever used force, except in this instance.

D. Fay, U. S. Dist. Atty.

D. Farrand, for the prisoner.

LIVINGSTON, Circuit Justice (charging jury). A very solemn and important office now devolves on you, no less than that of deciding whether a fellow citizen has forfeited his life to the laws of his country. It is not often that we are called to the discharge of a more interesting, and at the same time, more painful and delicate duty. It must, however, whenever it occurs, be met with firmness; and, while it is performed with all the humanity and caution due to a party accused, sight must not be lost of those claims which, if a crime has been committed, the public have upon us. The offence charged in the present instance is that of treason. The indictment having been recently read in your hearing, I will not, at this late hour, trouble you with repeating it. To this charge, the prisoner has pleaded not guilty, and for trial has put himself on a jury of his country. Nor will I detain you with a recapitulation of the facts, as they have appeared in evidence, about which there is no dispute, and on which you are now to say, whether the prisoner at the bar be guilty of the crime of treason. But, although there be little, if any, controversy in relation to the facts on which the public prosecutor relies, you will naturally expect some direction from the court, how far, in point of law, they support the charge alleged in the indictment. This direction, with its reasons, the court will now proceed to give you.

Treason, not only holds a conspicuous, and generally the first place in every catalogue of crimes, but is almost universally punished with death. Government is so high a blessing, and its preservation and support are so essential to the welfare of every member of the body politic, that to attempt its subversion, has ever been regarded a most aggravated offence. But, the resentment so nat-

---

[1] [Reported by Elijah Paine, Jr., Esq.]

urally enkindled against those who are supposed to aim at the destruction of the only security which we enjoy for life, liberty, and estate, leads us frequently to include, under this high crime, offences greatly inferior in turpitude, much less dangerous in their effects, and in every respect, of a different description and tendency. To prevent, therefore, as far as possible every abuse by the extension of treason to offences, which, in times of public agitation, might, by violent or corrupt constructions, be pretended to belong to it, there was inserted in our national compact, a rule which was to be binding on every department of government. To define and provide punishments for other crimes of federal cognizance, is left to congress; but, with a jealousy on this subject, which a full knowledge of the excesses that had so often been committed in other countries by parties contending for dominion, was well calculated to excite, no other trust was here reposed in the legislature, than that of prescribing in what way treason was to be punished. For its definition, resort was ever to be had to that great fundamental law, which was to be binding at all times; and was not liable to be changed on a sudden emergency, so as to gratify the vengeance, or promote the views of aspiring or designing men. In the constitution we accordingly find this very limited definition of it: "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort."

The United States having no public enemy, it is only the first branch of this definition which will require your attention. With all the solicitude which was felt by the framers of our constitution to produce certainty, and to exclude interpretation in a matter so momentous, and with all their circumspection to avoid the use of terms in any degree vague or indefinite, cases have already occurred in this country, and will, no doubt, again arise, in which it will be difficult to say, whether the acts in question amount to a "levying of war," within the meaning of this instrument. Such is the imperfection of language, and so limited human foresight, that it is very difficult, whatever care be employed, always so to describe an offence, as not to leave some doubt of the meaning of the legislature, and still more so, to anticipate every case of a similar nature, which it might have been proper to provide for. To a system of laws so perfect, that Being, who takes in at one view, the past, present, and to come, is alone competent. When doubts, however, arise, as they often must, whether an offence belongs to the class assigned to it in the indictment, their solution in the first instance devolves on the court, whose duty it then is, to give a jury such instructions as it may deem necessary, for their correct understanding of the law.

Having a constitutional regulation on the subject before us, it may be expected by some, that the court will compare with the terms of that instrument alone, the facts which have appeared in proof, and by such test, determine whether the crime of treason has been committed. Were our examination thus restricted, it is impossible a moment's doubt could be harboured of the true character of this transaction. "A levying of war," without having recourse to rules of construction, or artificial reasoning, would seem to be nothing short of the employment, or at least, of the embodying of a military force, armed and arrayed, in a warlike manner, for the purpose of forcibly subverting the government, dismembering the Union, or destroying the legislative functions of congress. These troops should be so armed, and so directed, as to leave no doubt, that the United States, or their government, were the immediate object of their attack.

But, a wider range has been taken at the bar. Not only the constitution, but precedents have been resorted to, to furnish a rule for the present case. The court, so far from feeling a disposition to find fault with this mode of treating the subject, has no objection to adopt it, in its remarks to you. It has already been observed, that, taking the constitution as our guide, not a doubt can be entertained of the prisoner's innocence of treason. Let us see, then, whether the different acts, which in England, or in this country, have been regarded as constituting the crime of "levying war," will make any difference.

In taking notice of precedents, set by British tribunals, the court does not mean to give any opinion on their binding effect in the United States; or discuss a question which has been much agitated—whether, by the use of these terms, it was intended to adopt the technical meaning which they had already received in England; or whether, considering treason as a new offence against a newly created government, the constitution on this point was to be interpreted by itself, without reference to, or with the aid of any common law decisions whatever? These questions will be left unconsidered—a decision of them now not being thought material. For, if the court does not greatly err, no construction in England, and certainly none in America, has yet carried this doctrine the length to which we are at present expected to go.

In the first place, it is well understood, in both countries, that war must be actually levied, and that no consultation or conspiracy to subvert the government, or laws, however atrocious the offence, can amount to treason. In England, all insurrections to dethrone or imprison the king; or, to force him to change his measures, or to remove evil counsellors; to attack his troops in opposition to his authority; to carry off or destroy his stores provided for defence of the realm, if done conjointly with and in aid of rebels, or enemies, and not only for lucre, or some private, malicious motive; to hold a castle or fort against the king, or his troops, if actual force be

used in order to keep possession; to join with rebels freely and voluntarily; to rise for the purpose of throwing down by force all enclosures; alter the established law, or religion; to reduce the general price of victuals; to enhance the price of all labour; to open all prisons; that is, to effect innovations of a public and general concern by an armed force, or for any other purpose which usurps the government in matters of a public and general nature. All these acts have been deemed "a levying of war." So also have insurrections to redress by force national grievances; or to reform real or imaginary evils of a public nature, and in which the insurgents had no special interest; or, by intimidation and violence,—as was the case with Lord George Gordon, who however was acquitted,—to force the repeal of a law. But, when the object of an insurrection is of a local or private nature, not having a direct tendency to destroy all property and all government by numbers and armed force, it will not amount to treason; and, in these, and other cases that occur, the true criterion is, the intention with which the parties assembled.

Having thus brought into one view the principal cases which, in England, have been adjudged to amount to levying of war, the court will now proceed to the trials which have taken place within the United States, for treasons of the same description. In 1794, an insurrection took place in four of the western counties of Pennsylvania, with a view of resisting and preventing, by force, the execution of certain acts of congress imposing a duty on spirits distilled within the United States. In the trial of U. S. v. Mitchel [Case No. 15,788], who was indicted for treason, before a circuit court of the United States, at which Judge Patterson presided, the court held, that "to resist or prevent, by armed force, the execution of a particular act of the United States, is a levying of war against the United States, and, consequently, treason, within the true meaning of the constitution." On the trial of Fries [Case No. 5,126], before the same court, in 1799, for treason, the court (Judge Iredell presiding,) delivered the same opinion, and Fries was convicted. When Fries was again tried, —a new trial having been granted to him,— the same court, then composed of Judge Chase and Judge Peters, delivered the following opinion: "That an insurrection or rising of any body of people within the United States, to attain by force or violence any object of a great public nature, or of public and general or national concern, is a levying of war against the United States." "That any such insurrection to resist or to prevent by force or violence the execution of any statute of the United States, under any pretence of its being unequal, burthensome, oppressive, or unconstitutional, is a levying of war against the United States, within the constitution." Judge Iredell, in a charge to

a grand jury, having in view the insurrection in Bucks and Northampton, in the state of Pennsylvania, thus expresses himself: "If the intention be to prevent by force of arms the execution of any act of congress altogether, any forcible opposition calculated to carry that intention into effect, is levying of war against the United States."

The only occasion on which the supreme court of the United States has delivered any opinion on the doctrine of treason was, on the return of a habeas corpus, in the Case of Bollman [4 Cranch (8 U. S.) 75], who had been committed on a charge of that nature. "To constitute this crime," says the court, "war must be actually levied against the United States. However flagitious may be the crime of conspiring to subvert by force the government of our country, such conspiracy is not treason. To conspire to levy war, and actually to levy war, are distinct offences: the first must be brought into operation by the assemblage of men for a purpose treasonable in itself, or the fact of levying war cannot have been committed." "There must," says the court, in another part of its opinion, "be an actual assemblage of men, for the purpose of executing a treasonable design." And again, "It is more safe, as well as more consonant to the principles of our constitution, that the crime of treason should not be extended, by construction, to doubtful cases."

Having now stated the principal decisions abroad and at home, on the subject before us, let us go back to the indictment, and the evidence in support of it, and see if it be possible to bring the prisoner's case within any of those that have been mentioned. The offence laid, stripped of its artificial dress, and technical appearance, is nothing more than the forcible rescuing of a raft from the custody of a military guard placed over it by a collector. It is impossible, to suppress the astonishment which is excited at the attempt which has been made to convince a court and jury of this high criminal jurisdiction, that, between this and levying of war, there is no difference. Can it be seriously thought, that an American jury, with the constitution of the United States as a guide to their interpretation, or even on the cases which have been cited, can be brought, by ingrafting construction on construction, to leave far behind them, English judges and English juries, in their exposition of the crime of treason? Gentlemen, they cannot perceive the tendency of the doctrine which it is now asked of us to sanction. On which of the precedents cited do they rely for our support, or expect us to decide, that an opposition to law, so feeble, so transitory, so free from every traitorous intention, so destitute of every appearance of war, and so evidently calculated for the sole purpose of private gain, was making war against the United States? In what can we discover the treasonable mind, which common sense,

as well as all the authorities tell us, is of the very essence of this offence? Can it be collected from the employment of ten or twelve muskets? Some judges have said, how correctly is here of little moment, that the quantum of force is immaterial. But, when we find it so very small and despicable, it furnishes strong evidence of some intent, very far short of that of measuring their strength with the United States: unless, we can believe, that a force, if it deserve that name, scarcely competent to the reduction of a single family, were meditating hostilities and rebellion against a government, defended by several millions of freemen. But, there is no necessity of any forced interpretation, to arrive at the real intention of these parties. Their conduct shows it to have been of a private nature, and that no further violence was contemplated, than to smuggle a raft which had been seized by the collector, and was then lying at a small distance from a guard, into Canada: for, they forthwith proceeded thither, and having left it a little beyond the line, they returned directly to the United States, not at the head of an army, but peaceably and quietly, each man to his own home, not suspecting that they had a war on their hands, with any power, and least of all with the government of their own country.

Again—Whence is it collected, that their intention was to intimidate congress into a repeal of the embargo laws, or to resist their execution generally? If congress were in session, which was not the case, can gentlemen seriously believe, that means so inadequate would have been employed for purposes which an organized, numerous, and well disciplined army would have found it difficult to accomplish? If you look at the insurrections in 1794, and in 1799, you will be struck with the great difference between the cases which arose out of those occurrences, and the one on which you are now to decide. There is hardly a feature of resemblance; and yet, you are seriously expected to condemn the prisoner, as a traitor, for forcing some lumber from the possession of a collector, because Mitchel, Vigol, and Fries, (who, by the bye, were all pardoned,) were convicted as such, for being concerned in insurrections, which threatened the existence of government, were well calculated to intimidate the legislature, and for a time actually suspended the operation of certain laws which were deemed obnoxious in a large district of country.

It may not be very easy (unless open war and the broad face of rebellion be the criterion,) to fix the exact boundary between treason and some other offences, which partake, more or less, of an opposition to government. But, difficult as this may be, every one will at once perceive a very wide separation, between regular and numerous assemblages of men, scattered over a large portion of country, under known officers, and in every respect armed and marshalled in military and hostile array, for the avowed purpose, not only of disturbing and arresting the course of public law, in a whole district, by forcibly compelling the officers of government to resign, but by intimidation and violence, of coercing its repeal, and a sudden, transient, weak, unmilitary, and unsystematized resistance, and that in a solitary instance, and for the single object of personal emolument. As obvious is the distinction, between a large armed force, embodied in the heart of our country, with designs inimical to government and the laws, assuming an attitude of defiance, and opposition to any force which might be set against it, and a few dozen men, who, having committed an offence on the very confines of the United States, were in the act of flying to another government, and whose hostility, such as it was, could have no other motive, than that of favouring their escape. These cases cannot be considered as parallel, without destroying, at once, every distinction between trespasses, riots, and treasons. Not an instance can be found in England, during a period of several hundred years, which have elapsed since the statute of treasons, in which an act like the present, was determined to be treason.

Has the prisoner, then, it may be asked, been guilty of no offence? His conduct, no doubt, was highly culpable, and, if the courts of the United States have no common law jurisdiction in criminal cases, as some have thought, the legislature may declare such acts a crime, and assign to it such punishment as may be thought proper. It is not very clear, indeed, that the offence, which is now dignified with the name of treason, is not already provided for, by an act of congress, which punishes the resisting or impeding of any officer of the customs, or any person assisting him, in the execution of his duty, with a fine of four hundred dollars.

By another act, whoever shall knowingly oppose any officer of the United States, in the execution of process, or shall beat or wound him in such service, shall be fined and imprisoned; and, provision is made, by the same law, for the punishment of those who, by force, rescue a prisoner after or before conviction for a capital crime. It may also be remarked, that to kill a sheriff in the discharge of his duty, and who is as much clothed with the authority of law, as the collector or his agents were here, whatever be the number concerned, or the weapons employed, has always been held in England and this country, murder, and not treason.

These laws of congress have been mentioned, and others of a like nature might be referred to, to satisfy you, that the legislature never supposed an act of this kind treason, or they would only have declared its punishment; and, although, if it be treason by the constitution, no act of congress can make it otherwise; still, a legislative understand-

ing of that instrument, if not conclusive, is entitled to very respectful attention.

The court, may here again ask, whether it be a greater crime to take from the keeping of one public officer, where no death ensues, a property however valuable, than to force from the custody of another, a person whose life had been declared to be forfeited to the laws of his country; or, to kill a sheriff in the execution of his duty? In all these instances, the laws are opposed, and in the last case, with the aggravation of homicide; but as no traitorous intent exists in either, and no war is made against the United States, neither of them can fall within the meaning of treason.

But as so much stress is laid on the opinions of our own judges, whose attention has been judicially drawn to a consideration of this crime, you will bear with me a little longer, while I show you how very little ground there is for this reliance, and how dangerous a sense you are required to put on these decisions. Nothing will be more easy than to rescue their characters from the reproaches which would adhere to them, if they had really declared, (for such is the language of this prosecution,) that every opposition to a public law, no matter how momentary, how slight, in what shape, or for what purpose, amounted to treason. Not one of them has said any such thing, nor intimated a sentiment of the kind. Judge Patterson and Judge Iredell, who led the way on this occasion, and of whose valuable services death has since deprived their country, were as eminent for their abilities, as venerable for their erudition, and as much admired and beloved for their humanity and virtues, as any men that ever ascended the bench of justice; and it would be a subject of mournful retrospect for them, if such contemplations could now employ their thoughts, that the authorities of their names should be resorted to, for introducing a doctrine which, if here, they would resist with all the energy of talents, and weight of character, for which they were both illustrious. You are already acquainted with the occasions on which these opinions were delivered, and have seen how totally the resemblance fails, between them and the one which has called us together. These opinions have also, in part, been stated to you; but, permit me, now, to read other passages, from them, which apply more directly to the case before us. If a statement of facts like the present, had been submitted to Judge Iredell, and he had been obliged to examine and decide on them, he could not have expressed himself in terms more appropriate, or have delivered an opinion more exactly suited to them, or more in favour of the prisoner, than the one which he gave on the occasion which has been already referred to: after describing what resistance, and with what intent, to a public law, amounted to treason, he proceeds,—"But if the intention be merely to de-

feat its operation in a particular instance, or through the agency of a particular officer, from some private or personal motive, it does not amount to the crime of treason. The particular motive must be the sole ingredient in the case; for, if combined with a general view, to obstruct an execution of the act, the offence must be deemed treason." The language of Judge Patterson, if not quite as explicit, conveys the same meaning. "The prisoner," says he, meaning Vigol, "went to the house of two different excise officers, in arms, marshalled and arrayed, and at each place committed acts of violence and devastation." "With respect to the intention," he proceeds, "there is not, unhappily, the slightest possibility of doubt. To suppress the office of excise in the fourth survey of Pennsylvania, and particularly, in this instance, to compel the resignation of the officer, so as to render null and void in effect an act of congress, constituted the apparent, the avowed object of the insurrection, and of the outrages, which the prisoner assisted to commit. Combining these facts and these designs, the crime of high treason is consummated in the contemplation of the constitution and law of the United States." On the trial of Mitchel, the same judge observes: "If the object of the insurrection was, to suppress the excise office, and to prevent the execution of an act of congress, by force and intimidation, the offence, in legal estimation, is high treason. The object was of a general nature and of national concern." But Judge Chase is supposed to have gone further. This is another mistake. As little support can be derived to the prosecution from his opinion, in the Case of Fries. That great and truly profound lawyer, on the fullest consideration, concurred in the judgments which had already been delivered by two of his associates, and expresses himself with all the perspicuity, strength, and precision, for which he is so greatly distinguished. What, in his estimation, constituted treason, has already been seen. You will now hear what he thought of a partial opposition to an act of congress, and for a private or special purpose. On this point he is too explicit to be misunderstood; and yet, that must have been the case, or this prosecution would not have been heard of. "The court," says he (for Mr. Peters, the district judge, whose high judicial reputation adds much to the value of his opinions, concurred with him,) "think, that the assembling bodies of men, armed and arrayed in a warlike manner, for purposes only of a private nature, is not treason, although the judges and peace officers should be insulted and resisted, or even great outrages committed to the persons and property of our citizens."

These learned judges also consider the intention as the only true guide in ascertaining whether certain acts amount to treason, or a less offence, and regard the universality, or generality of the design, as forming an essen-

tial ingredient in the composition of this crime. On this point they thus express themselves: "The true criterion to determine whether acts committed are treason, or a less offence, (as a riot,) is the quo animo. the people did assemble. When the intention is universal or general, as to effect some object of a general, public nature. it will be treason, and cannot be considered, construed. or reduced, to a riot. The commission of any number of felonies, riots, or other misdemeanors, cannot alter their nature. so as to make them amount to treason   And, on the other hand, if the intention and acts combined amount to treason, they cannot be sunk down to felony, or riot. The intention with which any acts (as felonies, the destruction of houses, and the like,) are done, will show to what class of crimes the case belongs." If these opinions are understood by the court, and there seems no ambiguity or obscurity in either of them, they all, in express terms, exclude from the rank of treason the facts which compose the present offence; and whatever doubts have been and are yet entertained, by many professional gentlemen of extensive erudition, and exalted integrity, of such parts of these opinions as brought the cases of the insurgents within the constitutional definition of treason, no objection ever has, nor perhaps ever will be, made to the exceptions, which have been so cautiously interwoven into them, for the very purpose of preventing their extension to cases of this kind. Once disregard these exceptions, and render the constitutional rule as flexible or comprehensive as it is now suggested to be, and prosecutions for treason will become as common as indictments for petit larcenies, assaults and batteries, or other misdemeanors. If every opposition to law be treason, for very like this is the language we have heard, as all offences partake in some measure of that quality, who can say how many of them will in time become ranged under the class of treason. Neither you, nor the court, can feel any ambition of leading the way, in setting a precedent so dangerous, or one that will in any degree tend to demolish that barrier which has been raised by the constitution against constructive treasons.

You have been reminded, in the course of this trial, that in criminal cases, a jury has a right to take upon itself the decision of both law and fact. There is no design in the court to dispute this position, or in any degree to encroach on your prerogatives. The trial by jury, whatever doubts may exist as to its excellence in civil actions, has uniformly received, and is most eminently entitled to the highest praise, as a mode of determining between the public and a party accused. It is a subject on which the stores of panegyric have been exhausted. Its perpetuity in this country is secured by the federal constitution, which in this respect, is only a transcript of the provisions which had already found a place in those of the several states. But while you have this right, the court has also its duties to perform. As judges, we are not sent here merely to preside at trials, to preserve order. and to regulate the forms of proceeding; we have a much higher and more important trust committed to us: it is our right and our duty to expound the law to a jury in criminal, as well as civil cases; and although it be not denied, that in public prosecutions, you may decide contrary to such interpretations, it is not too much to say, that it is nevertheless your duty to pay a very respectful consideration to every proposition of law you may receive from the court. Judges have ever been regarded as the proper organs of law; and when it is recollected that they act under the same solemn sanction with yourselves, and have the same interest in a pure administration of justice, it is not probable that any motive can exist, intentionally to deceive you. And who, may it fairly be presumed, generally speaking, will be the best informed on these subjects? Those whose attention has for many years been more or less directed to the jurisprudence of their country, or those whose avocations have left little or no leisure for such inquiries? You are not then, to consider as an intrusion, what it would be a dereliction of duty in a judge to withhold from you; his opinion on the law of every case under consideration. You are already apprized of ours on that, on which you are now to decide. I have the satisfaction to say, that there is no diversity of sentiment between the district judge, with whom I have the honour and pleasure of being associated, and myself. It is the opinion of both of us, that if you believe, which abundantly appears from the testimony, and seems to be conceded on the part of the government. that the prisoner, among others, was hired by the owner of this raft, for the purpose of evading the embargo laws, only in this instance, and for his own private emolument, although it may have been part of the plan to use violence, and force were actually employed against the collector or his agents to accomplish this object, but that this formed no link in a conspiracy to resist or impede the operation of these laws within the district generally as far as their means enabled them, (every attempt to produce proof of which has failed,) then the prisoner is not guilty of the crime of levying war; for then, his case falls most precisely within the exception which has already been read to you from the opinion of Judge Iredell. The intention which all the cases speak of, is not understood by the district attorney and the court in the same sense. He seems to consider, that if the intention be to oppose a law, no matter with what motive, treason is committed; whereas, it is the intention with which such resistance is made, not the opposition itself, that forms the criterion: otherwise, every wilful opposition to a statute, would necessarily be a levying of war. With respect

to the prisoner's intention it is made out most satisfactorily, by every witness that has been examined on the part of the public. On this point, there will be, happily for him, no doubt in your minds. There is no testimony of his ever having been before, or since, engaged in a resistance to these or any other laws. The court cannot help thinking that the district attorney must have been greatly deceived in the information which was given to him, of the prisoner's conduct, and that the proofs on trial have fallen very far short of his expectations, or that you would never have been put to the trouble of deciding on this case. But as, notwithstanding the discussion which has taken place, he seems seriously and sincerely to believe treason has been committed, the court has thought it a duty to state to you its opinions, most explicitly, the other way; so that, if any mistake be committed by so great an extension of the crime of treason, neither of us may be chargeable with it; for, "we cannot be too wary," in the language of the great and good Lord Hale, "in multiplying constructive treasons, for we know not where they will end."

The court will now finish its charge. If it has been tedious, you will impute it not to a desire of trespassing unnecessarily on your time, but of guarding you, in a case of very general concern, against those mistakes which the earnestness and eloquence of counsel sometimes produce; and although we might have been content with stating our opinion on the law, in more general terms, we were willing you should know, that it was not merely a speculation of our own, but one which we believe to be sanctioned by the constitution of our country; by decisions in England; by various judgments of our domestic tribunals; and, as far as can be collected from their acts, by the sense of our national legislature.

In addressing you, then, at some length, and with all possible plainness, the court have felt no other motive than a desire to assist you in coming to a correct result on a point which, to the honour of this state, has never before been a subject of public discussion within it.

The whole case, both law and fact, is now committed to you, in the fullest confidence, that you will do justice to your country, the prisoner, and yourselves.

Verdict of acquittal.